Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK KISTENMACHER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION, and JEN-HSUN HUANG,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mark Kistenmacher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NVIDIA Corporation ("Nvidia") or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Nvidia between October 9, 2025 and November 8, 2026, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

[1] Unless otherwise noted, all emphasis is added and internal citations are omitted.

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant NVIDIA is a technology company. Pertinent to this action, NVIDIA develops various products for which the export market for which is tightly controlled as a result of their impact on national security. Pertinent to this action, there are broad export controls to prevent Nvidia chips from being shipped to China.

8. The Company is incorporated in Delaware and its headquarters are located at 2788 San Tomas Expressway, Santa Clara, CA 95051.

9. Nvidia common stock trades on The Nasdaq Global Select (the "NASDAQ") under the ticker symbol "NVDA".

10. Defendant Jen-Hsun "Jensen" Huang ("Huang") has served as Nvidia's CEO at all relevant times. He also serves on the board of directors (the "Board").

11. Defendants Huang is sometimes referred to herein as the "Individual Defendant."

12. The Individual Defendant:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. The Company is liable for the acts of the Individual Defendant and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15. The Company and the Individual Defendant are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### <u>Issued During the Class Period</u>

16. On October 9, 2025, The New York Times published an article entitled "A Mystery C.E.O. and Billions in Sales: Is China Buying Banned Nvidia Chips?" The article had a subheading entitled "an executive of a Singaporean firm called Megaspeed socialized with Nvidia's Jensen Huang. Now the company is being scrutinized by U.S. officials for its ties to China."

17. The article stated in part the following:

> On a humid June night last year, Jensen Huang, the chief executive of Nvidia, held court with several of his company's major Asian customers at a bar with sweeping views of Taipei. They stood and toasted the booming artificial intelligence industry.

> ***Next to the Nvidia chief was a woman named Huang Le, or Alice Huang, an executive of a Singapore-based data center company called Megaspeed, which was poised to buy $2 billion of Nvidia A.I. technology over the next year***.
>
> ***Though Ms. Huang and Megaspeed are little-known players in the A.I. industry, their association with Nvidia and its chief executive has recently become a preoccupation in Washington***.
>
> ***Commerce Department officials have been investigating whether Megaspeed, which has close ties to Chinese tech firms, is helping companies in China sidestep American export restrictions, according to more than a half dozen current and former officials and other people familiar with the companies, who spoke on condition of anonymity to discuss an examination that is not public***.
>
> The inquiry, which is active, calls into question how closely Nvidia is tracking where its A.I. chips end up and highlights the possibility of American export laws easily being sidestepped. Megaspeed is also facing scrutiny from Singaporean police, who told The New York Times in a statement that they are investigating the company for breaching local laws, without elaborating further.

18. In the section below, the article quoted John Rizzo ("Rizzo"), an Nvidia spokesman, as stating the following in response, which imputes to Nvidia:

> Nvidia said there was no evidence that its chips had been smuggled into China. John Rizzo, a spokesman for Nvidia, said in a statement that the chipmaker had "engaged with the U.S. government" regarding Megaspeed. Nvidia's compliance team also looked into Megaspeed and determined it was "***wholly owned and operated by a company based and headquartered outside China, with no China shareholders," he said***.
>
> Mr. Rizzo said Nvidia had visited Megaspeed's facilities multiple times. During a visit this week, he said Nvidia employees "found no evidence of diversion, and confirmed what we previously observed — Megaspeed is running a small commercial cloud, like many other companies throughout the world, as allowed by U.S. export control rules."

19. The statement in ¶ 18 was materially false and misleading at the time it was made because Jensen Huang had an affair with Alice Huang, a Megaspeed executive and suspected Chinese spy, who is suspected of seeking to help smuggle NVIDIA products into China.

20. The article then stated the following about Jensen Huang's relationship with Alice Huang:

> ***It is not clear when Mr. Huang and Ms. Huang, who are not related, first met. She was mingling with a crowd of tech executives just after midnight at the Taipei bar in early June of last year when she offered to ask Mr. Huang of Nvidia to join them, recalled Parker Schmitt, an executive who was with the group.***
>
> "She said, 'I bet you guys I can get Jensen here,' and then Jensen immediately showed up," Mr. Schmitt said, referring to Mr. Huang by his first name. Photos posted to LinkedIn by NetThunder, a data software provider where Mr. Schmitt is chief executive, show Mr. Huang at the bar with the group.
>
> Shortly after Ms. Huang reached out, Mr. Huang arrived in his trademark black leather jacket and drank a whiskey shot with the group. He was accompanied by two other Nvidia executives and had planned to attend the party, said a person close to the company.

21. In seeming response to this part of the article, Rizzo was quoted as saying "[***o]ur field operations teams often host groups of customers and partners at conferences, and when Jensen is available, may ask him to visit to provide updates on the market***[.]"

22. The statement in ¶ 21 was materially false and misleading at the time it was made in context because Jensen Huang had an affair with Alice Huang, a suspected Chinese spy.

23. On October 29, 2026, The New York Times published an article entitled "Nvidia Chief Seen as Target of Chinese Spy Plot." The article stated in part the following:

> ***American spy agencies had gathered striking intelligence***.
>
> ***A top executive at a Singapore-based data center company was under scrutiny for possibly steering advanced Nvidia A.I. chips to China***. And now ***American officials had concluded that she was a Chinese intelligence asset***, funneling information to Beijing.
>
> ***But what came next was even more alarming. Surveillance of the executive, Alice Huang or Huang Le, a Chinese citizen, revealed that she had developed a close relationship with Jensen Huang, Nvidia's chief executive***.
>
> ***For years, Washington has worked to deny China the technology needed to match or surpass the United States in the intense global competition for superiority in artificial intelligence***. The discovery that Beijing was getting reports from someone with direct access to Mr. ***Huang, one of the most powerful figures in the A.I. revolution as well as an influential ally of President Trump's, set off alarms at the White House.***
>
> ***Roughly a year ago, Mr. Trump was briefed about the intelligence findings, which have not been previously reported, and chose not to do anything with the information***. Mr. Trump

> has been wary of disrupting Nvidia's chip sales, which are helping to drive the economy and the stock market, and of further complicating the trading relationship with China.
>
> This account is based on interviews with people briefed on the surveillance, who spoke on the condition of anonymity because the findings are drawn from classified intelligence, as well as other officials and industry executives and analysts.
>
> American officials already suspected that Ms. Huang was helping China evade constraints on its ability to gain access to advanced A.I. chips.
>
> ***But the revelation that she was feeding information directly to Beijing raised more troubling possibilities, including that Ms. Huang had insights into Mr. Trump's thinking on an issue of vital importance to both nations, one likely to come up when the president visits China next month***. And it left questions about whether she could be gleaning information about Nvidia, which as much as any company accounts for the lead the United States has maintained in developing cutting-edge A.I. models.

24. The article further stated the following about assessments regarding Defendant Huang's potential awareness of Huang Le's activities as an alleged Chinese spy:

> When Mr. Trump was initially briefed on the intelligence last year, U.S. officials did not believe the Nvidia executive knew that Ms. Huang was gathering information for the Chinese. ***It is unclear whether intelligence officials have since updated their assessment, but some senior officials inside the Trump administration doubt that Mr. Huang could have remained unaware of what they had concluded was her intelligence-gathering role for China***.

25. The article further stated the following about investigations into Megaspeed and indications that it helps China evade export restrictions on Nvidia products, as well as Megaspeed's activities:

> ***The U.S. government has been investigating Megaspeed since late 2024, when a Commerce Department official visited its data center in Malaysia and found the site to be suspicious***. The Nvidia equipment was still packed in boxes, suggesting it was being shipped in or out rather than installed there.
>
> Singapore has conducted its own investigation into Megaspeed. In 2025, Singaporean authorities brought Ms. Huang in for questioning, but subsequently released her.
>
> * * *
>
> ***Megaspeed is essentially a middle man***. It has bought Nvidia chips from the American arm of Inspur, a Chinese server maker. The U.S. has blacklisted Inspur's parent company for funneling technology to the Chinese military, though the U.S. firm remains free of sanctions.
>
> Megaspeed has then provided that computing power to Alibaba and other Chinese companies. U.S. officials believe the firm is one piece of a sprawling international effort by Chinese

> companies to access the chips needed to build and run A.I. ***Investigators suspect that some Nvidia chips acquired by Megaspeed are also finding their way illegally into China.***

26. The article quoted, John Rizzo, an Nvidia spokesman, as stating the following, which imputes to Nvidia under the doctrine of *respondeat superior*:

> ***Jensen's interactions with Ms. Huang are not unusual or unexpected. Meetings with customers are part of a C.E.O.'s job; Jensen talks with thousands of customer executives every year."***

27. The statement in ¶ 26 was materially false and misleading at the time it was made because Jensen Huang had an affair with Alice Huang.

28. On October 30, 2026, Bloomberg published an article entitled "Nvidia CEO Says Ties to Company in Spy Probe Were 'Normal'". The article stated, in part, the following:

> ***[Jensen Huang] said the chipmaker's dealing with Megaspeed International were "normal and not unusual"*** following a New York Times Report that one of the Singapore firm's executives is under investigation for spying on behalf of China.
>
> Nvidia's relationship with Megaspeed's officials was proper, and the chipmaker has checked to ensure that Megaspeed didn't illegally send its [AI] processors to China, Huang said in an interview Thursday. ***That country is barred from buying Nvidia's powerful AI chips – known as graphics processing units, or GPUs—under US export rules***.
>
> "***We've studied all their deployments of our GPUs and counted every one***," [Jensen Huang] said in the interview. "And I think the US government also has as well."
>
> The remarks follow a Times story that the US government is investigating an executive from Megaspeed for allegedly providing information to the Chinese government. ***Huang Le has previously been pictured with Nvidia's leader on social media, and the story reports that she may have been serving as a Chinese agent aiming to evade chip export controls***.

29. The statements made by Defendant Huang in ¶ 28 was materially false and misleading at the time they was made because Jensen Huang had an affair with Alice Huang, a suspected Chinese spy, rendering the relationship not "normal and not unusual."

30. The statements referenced in ¶¶ 18, 21, and 26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Jensen Huang had an affair with a suspected Chinese spy, who also has a role at a company called Megaspeed, which is suspected of helping China evade export controls; (2) as such, Nvidia's statements about its relationship with Megaspeed were materially false and misleading at all relevant times; (3) the foregoing raised concerns in the national security community about Nvidia and, if revealed, presented a material risk to the Company's reputation and business prospects; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

31. On November 8, 2026, NVIDIA issued a statement from its board of directors, which stated the following:

> ***The NVIDIA Board is initiating an independent investigation in light of recent reporting that founder and CEO Jensen Huang has been the target of a foreign intelligence effort***.
>
> A committee of independent directors, assisted by outside independent counsel, will oversee the investigation.
>
> The Board prioritizes U.S. national and economic security, which is paramount to the interests of NVIDIA and its shareholders.
>
> While the Board has no reason to believe that either national security or NVIDIA secrets were compromised, the Board's inquiry will examine all available information.

32. On November 8, 2026, The New York Times published an article entitled "Nvidia Opens Investigation into Jensen Huang's Relationship With Suspected Chinese Spy". The article stated as a subheading that "Mr. Huang[,] ***acknowledged on Sunday that he was intimate with a business executive who U.S. officials had determined was working for Chinese intelligence***."

33. The article further stated:

> Nvidia said on Sunday that it was opening an investigation into Jensen Huang, its chief executive and co-founder, ***after he acknowledged to the company's board that he had been intimate with a business executive who U.S. intelligence determined was a Chinese spy***.

> ***Mr. Huang's relationship with the woman, who goes by Alice Huang, became a U.S. government concern after surveillance revealed that she was feeding information directly to Beijing***. The revelation raised troubling possibilities because Mr. Huang is one of the most powerful figures in the A.I. revolution as well as an influential ally of President Trump.
>
> In a message to the company, Mr. Huang apologized. ***"I was unfaithful to my wife," he said. "My actions hurt her and our children. There is no excuse for what I did. I am deeply sorry***."

34. On this news, Nvidia stock fell $7.97 per share, or 4.27%, to close at $178.67 on November 9, 2026.

35. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency

of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts

and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

50. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

51. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

52. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

53. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendant**

55. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56. During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct

of the Company's business affairs. Because of his senior position, he knew the adverse non-public information regarding the Company's business practices.

57. As an officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

58. Because of his position of control and authority as a senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendant therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

59. The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management positions and/or being directors of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

60. By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Date: November 9, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*